DADE}, J.,
pronounced the following opinion :
This is a Case adjourned to this Court by the Superior Court of Daw for the county of James City, and City of Williamsburg. The facts are these: At the last Pall Term of that Court, on the second day of the Term, and about the hour, to which the Judge had, on the preceding evening, adjourned the Court, as the Judge was 'going into the Court-house, he met the Defendant on the steps. The Judg'e saluted the Defendant in the usual manner: upon which the Defendant said, that he did not speak to any person who was so corrupt and cowardly as to attack the character of any man so entirely defenceless as his was, when it was attacked by the Judge in the trial of a Cause depending on that docket. ' The Cause alluded to appears to have ' been one instituted by the Mayor, &c. of Williams-burg, for the use of J. W. Murdaugh v. Burwell Bassett, a security for the Defendant in a bond, which he had executed to the Mayor and Aldermen of Williamsburg: In which a verdict had been rendered at the preceding Term of that Court, and which stood on the docket for trial at thé then present Term. Immediately on opening the Court, the Judge made a statement of these facts in writing, and caused the affidavits of several witnesses to the same effect to be taken; and, the Defendant being present, a Rule was made on him, *292 returnable on the morrow to show cause why he should not be committed or fined for his said contempt; and enter into recognizance with.security, for his good be-haviour in such penalty, and for such time, as the Court should adjudge.” On the following day, the Defendant did appear and was recognized to appear the next day, to answer such interrogatories as the Court should propound to him touching his supposed contempt; and further to appear at the next Term to abide the judgment of the Court. On the third day the Defendant appeared in discharge of his recognizance, as is said, and thereupon certain interrogatories were propounded to him *by the Attorney for the Commonwealth, to which he answered, and admitted the words, and their allusion in the fullest extent, as stated above.
In this state of the Case, at the instance of the Defendant, the following questions were adjourned to the General Court:
1. “Does the attack made on the Judge of -this Court, and which appears by the evidence in the record to have been made, amount to a contempt of the Court; if so, may the Defendant be. committed or fined for the contempt?” :
2. “Ought a Rule for an attachment, pr an attachment to be awarded against him?”
3. “If the Defendant has committed a contempt, has he purged himself thereof by his answers to the interrogatories in this Cause?”
4. “What ought to be the judgment of the Court in this Case, on the facts appearing on the record?” And
5. All other questions which may arise on the record and evidence.
If the Judges, in the discharge of their official duties, could permit themselves to be influenced by personal considerations, they might deplore the occurrence of this Case.
They cannot but feel it a delicate and invidious task, to define and decide .upon the extent of their own powers, nor be ignorant, that the judgment they are called upon to render, may expose them on the one hand to the -imputation of timidity and irresolution, or on the other, to that of usurpation and tyranny. The verity of these suspicions would not be more unworthy of the Judges than the fact of their shrinking from this question, because of the consequences in which themselves might be involved by it. lOvery occasion of resort to their extraordinary powers, should, without doubt, be carefully avoided by them: but when forced upon them, should be met in the front with deliberation and firmness. And although the issue of the contest might be to prove them naked, powerless and defenceless, they would yet prefer this to a flimsy panoply of deception, which would be a defence against the weak only, until the strong should please to tear it from their shoulders. With such sentiments they have entered upon the consideration of this Case: conscious that they have less at stake than the public, and regardless of consequences, which could not have been averted without a dereliction of duty. *In this country, we know no privileges but such as exist for the public good. Many such privileges we have; from those which appertain to the Legislature itself even down to such as belong to the lowest Executive officer. Those, which surround the administration of justice, belong to the same order. Courts, their officers and process, are shielded from invasion and insult, not from any imaginary sanctity in the institutions themselves, or the persons of those who compose them, (as in the political and ecclesiastical establishments of another hemisphere,) but solely for the purpose of giving them their due weight and authority, and to enable those who administer them, to discharge their functions with impartiality, fidelity and effect. This is the true test of every privilege, not granted by Statute, and is the spirit of every one, (not merely private,) which is so secured. The political character of the Judiciarjq and the tendency of the duties which are devolved upon it, have rendered it necessary to invest it with a considerable sh.are of these privileges. It is confessedly'the weakest' branch of all governments; wielding neither wealth, force nor patronage. Its duties consist in adjusting and settling the contested rights of individuals, in controling their turbulence, and punishing their crimes. These duties are often of a severe and rigorous character; and they are generally to be discharged in almost immediate contact with those on whom they act: their exercise will frequently elicit the angry passions, or excite unworthy and sinister attempts to bias or avert their operation : and where there is little real power, and no patronage, a certain degree of external dignity may have been considered necessary to supersede a too frequent resort to the actual powers of the Courts.
In these principles is to be found the basis of the whole doctrine of attachment for contempts. To the first of them, (that of giving efficacy to the ordinary powers of the Courts) are referable attachments of inferior Judges and Magistrates, for con-tempts in acting unjustly, oppressively or irregularly in their offices, or in disobeying the writs issuing from the Superior Courts to them; such as writs of Prohibition, Certiorari,Mandamus, &c. (Vide Keble 484; 6 Mod. 90.) So those committed by Sheriffs, Bailiffs, &c. (3 Hawk. P. C. 151; 2 Burrow, 692, 797.) Those committed by witnesses, jurymen and parties, (Barnes 30, 32; Stra. 1094.) Those committed by Attornies *and other officers of the Courts; (2 Hawk. P. C. 144; Barnes 29, 31.) And to the second head, all that large class of contempts, which are summed up by Blackstone, as “demonstrating a gross want of that regard and respect, which when once Courts of Justice are deprived of their authority (so necessary for the good order of the Kingdom,) is entirely *293 lost among the people.” (4 Black. Com. 285.) The enumeration of the Cases coming under this latter head of contempts, would answer little other purpose than to illustrate the great extent of the exercise of the power of attachment in England. Contempt in using rude and offensive language in the face of the Court. (Cro. Car. 503.) Obstinacy, perverseness or prevarication, breach of the peace, or wilful disturbance in Court, (3 Inst. 141, 142). Treating with contumely or disrespect the Writs, process, rules and orders of the Courts; (Stra. 185, 557, 567, 1068;) perverting them to the purposes of malice, extortion or injustice; speaking or writing contemptuously of the Court; or Judges acting in their Judicial capacity. (4 Black. Com. 285.) Printing false accounts, &c. of causes pending in judgment, (2 Atkins 469). And many others which might be cited. The following which seem to consist in the breach of a necessary privilege, are in spirit so analogous to the case in hand, that I shall be excused for protracting the eumeration at the same time, that it will be unnecessary to waste time in drawing the parallel. Sir William Blackstone in 4 Com. 126, says, “Likewise all those who are guilty of any injurious treatment to such as are under the immediate protection of a Court of Justice, are punishable by fine and imprisonment; as if a man assaults or threatens his adversary for suing him; a Counsellor or Attorney for being employed against him; a juror for his verdict; or a gaoler or other ministerial officer for keeping him in custody and properly exercising his duty; which offences, when they proceeded further than bare threats, were punished in the Gothic constitutions with exile and forfeiture of goods.” To these maj be further added, a Case in 1 Wilson, 75; where an attachment was awarded against one Redman, for threatening the prosecutor in an Indictment for a misdemeanor with danger of his life, and saying to him, that he would be hanged.
In the whole of this second class of con-tempts, I do not recognize a single Case, which does not derive its authority, ^either from the idea, remote or proximate, of its being disrespectful to, or in derogation of the dignity of the courts, or from that power of self-protection which is necessarily inherent in Judicial institutions. An ideal, imaginary being without form, substance or locality, needs no protection from Penal sanctions. A Court, separated from the persons who compose it, is of this description. A sensible writer has said, that “the terms, Nation, State, Community, are words only: they do not denote any thing separate from the individual members, whose aggregation and association have received these names.” The like may be affirmed of a Court of Justice. When, therefore, we find attachments issuing for light and contemptuous words used in reference to the Writs, Process, Rules and Orders of the Courts, it is not because the efficacy of the Writ, Process, Rule or Order is impaired by such contumely, nor that the abstract, ideal, invisible Judicial institution, called a Court, is injured; but that the dignity and authority of the officers, in whom this ideal being is realized and personified, is sunk and degraded. It is, that the impunity of such conduct may deprive these institutions of the aid of public opinion in carrying into effect their ordinances, and render a resort to force in all cases necessary: A condition, in which it is probable, that no Judicial system could long exist.
Nor can it be thought more necessary to defend the outworks and barriers of the Judicial authority, in order to give the fullest effects to its legitimate Acts, than to protect the system itself from that, which at one and the same moment, strikes at the purity of the institution and its influence on society. Judicial independence has been an object of constitutional care in this country. In the origin of this government, it was thought expedient to make that department independent, even of the Executive and Legislative branches, who are not presumed to do wrong; and shall it be said, that it is wholly unnecessary to make it independent of the passions and prejudices of all, who may conceive themselves injured by its legitimate proceedings? Shall a Judge be called independent, who is unavoidably placed in a situation in which he comes in conflict with the jealousies and resentments of those, upon whose interests he has to act, and be reduced to the alternatives of either submitting tamely to contumely and insult, of resenting it by force, or resorting to the doubtful remedy of an action *at Law? In such a state of things, it would rest in the discretion of every party in Court, to force the Judge, either to shrink from his duty, or to incur the degradation of his authority, which must unavoidably result from the adoption of either of the above alternatives. To suppose that the personal character of the Judge, would be a sufficient guarantee against this, is to imagine a state of society, which would render the office of the Judge wholly unnecessary.
To overturn the inference from these propositions, the argument rests: 1. On what I consider a misconstruction of the language of Blackstone’s Commentaries: 2. On the absence of a reported Case in point: And 3. On the fact, of their having been in England some harsh attacks on the official conduct of their Judges, which have not been punished by attachment. These will be considered in order:
1. In 4 Bl. Com. 283, that writer says, “The contempts that are thus punished, are either direct, which openly insult or resist the powers of the Courts or the persons of the Judges who preside, &c. ” and in page 285, in enumerating the contempts which degrade the Judicial authority, he refers to one, which consists “in speaking or writing contemptuously of the Court, or Judges acting in their Judicial capacity.” For the purpose of supporting the opinion, that *294 it is the dignity of the ideal being called a Court, as separate and distinct from the Judges who compose it, it is insisted, that in these two clauses the word “Judges” is introduced for the mere purpose of illustrating the author’s meaning, in the use of the word ,“Court.” I cannot receive this construction. It is not only not sustained by the context of the sentence, but is an explanation so wholly futile and unnecessary, as not to be attributed to that able and perspicuous writer. Wh3r tell his readers, in his fourth volume, after the ample exposition of the Courts, contained in his third, that by the word Court, thej" were to understand him to mean Judges, acting in their Judicial capacity? It is obvious to me, that in the first sentence the author meant to take the distinction between a disrespect of the, constitutional powers of the Court, and á personal disrespect of the Judges there sitting: and in the second, that the object was to discriminate between a contempt of the Judges actually holding a Court, and a ^contempt of the same persons whilst discharging Judicial ^duties appertaining to their official character, though riot to be performed in Court; of which there are many, not necessarj' to be here enumerated. I am so well satisfied that this is the way in which Blackstone is to bp understood, that I shall forbear to remark,on the obvious consequence of establishing the construction urged by the Defendant’s Counsel; which would produce a complete identification of the persons of the Judges with the Courts, so as to make contempts of the one or the other, perfectly convertible. According to my construction of Blackstone, the persons of the Judges in or out of Court, when acting in their Judicial’.capacity, are clearly privileged. Why? Rot' because the indignity obstructs the course of justice; that is referable to another head; and is not assigned as the reason by Blackstone; but because, (to use his own words) “It demonstrates a gross want of that regard and respect which, when once Courts of Justice are deprived of, their authority (so necessary for the good of the Kingdom) is entirely lost among the people.” Nor in this particular, and for this end, is it of the least importance whether the contumely is used in open Court, at the moment when the occasion occurs, or the moment afterwards, when the carrier has proclaimed the adjournment, as the Judge descends the steps of the bench, or those at the Court-house door. The only real question in either Case is, whether it is his official conduct for which he is challenged and insulted. It was, however, very necessary for the Defendant to draw this distinction, for which his Counsel has,contended,'if possible; because it was foreseen, that there was no reason for protecting from insult the person of the Judge in Court, on account of his official conduct, whiiph did not equally apply to a protection out1 of Court, on the same account. It would have been shifting the ground, to maintain, 'that insult in Court was punishable, because it interrupted the business of the Court; because, besides it sometimes being of such a sort as not to produce this effect, it is always referable, in that aspect, to another head of attachment, viz: that for obstructing the powers of the Court.
2. We are told that no Reported Case can be found in the books, which sustains the idea of this being a contempt punishable by attachment. My own researches have indeed been as fruitless, as those of the Counsel. Whilst this power has been freely and frequently exercised by the Courts in defence of their extreme limits, we have no Case ^on record where it has been drawn out to repel an attack on the citadel itself. I cannot even find more than a single Reported Case (Harrison’s Case Reported in Cro. Cas.) in which it has been exercised for the punishment of a gross insult in facie curia sedentis. It was obvious to the most superficial observer of Judicial proceedings; it was a postulate which his feelings suggested, without reference to his judgment; that in this latter case, such a power must belong to the Courts; and accordingly, in the argument, that power has not been questioned. And, yet I repeat, that it is not supported by more than a single reported Case, but depends upon the same principles from which is deduced the power claimed by the Superior Court of James City, in the Case before us, and is, according to my construction of Blackstone, to be found in the same elementary writer, who has drawn together in the most condensed and perspicuous manner, the scattered authorities upon this head. At most, this is a negative argument; from the general force of which, where the principle is doubtful, it is not my purpose to detract. But, where the principle is clear, and the Cases are numerous, in which that principle has been sustained and enforced even by inference and deduction, and has been made operative by mere relation, it seems illogical to deny its direct and immediate application; because no case in point is to be found. When I find the Courts protecting their authority by punishing those who treat with disrespect their Process, Rules and Orders, although that disrespect shall consist in merely using light or contemptuous expressions of them; when I see them committing those who undertake to publish accounts of, or strictures on Cases depending before them, as in the Case in Atkins; when I see them punishing one, who has questioned a juror for his verdict, or a witness for his testimony; I enquire, why this has been done? I find in the Case of the Process, &c. that it was as effectual for its end and purpose, though spoken of contemptuously, as if received in silence, or treated with professed respect. In the case of the jurymen and witnesses, I do not find that the 'verdict had been influenced, or the judgment delayed: As, therefore, the actual authority of the Court, (meaning always the persons who compose it), was not obstructed, I perceive no other rea *295 son in the above Cases for its animadversion, than that its general authority and efficacy was impaired, and its dignity lessened; and that too, by an inference, *in some of the cases very remote and far-fetched. When Lord Hardwicke punished a printer for his publications respecting a Case before his Court, in which publications there was not one word disrespectful of the Chancellor, I perceive that the object was to check a practice by which, in the end, the opinions of the Court might come to be influenced. And, when I see the juror, and witness, protected from insult for what they may have said or done in Court; X ask, whether it is more necessary to defend these characters, who may perhaps never be again called into a Court of Justice, than the Judge, who must be so often exposed to similar trials. When in all these cases, I find the great object to be the preservation of the authority, dignity, impartiality and independence of the Judiciary, without which it has been said it could not exist, or, if existing, would be a curse rather than a blessing, I cannot feel justified in excepting a Case, which is in all its particulars, in direct hostility to this principle, because I cannot back my opinion by a reported Case.
Upon this part of the subject, and in reference to the Cases which have an indirect bearing on the present question, a distinction is attempted, for which I can find neither reason nor authority. It is said, that the attaching power may be exercised for contempts touching the prospective conduct of the Judge, but not for such as touch his past conduct. In reason, I see but one pretence for this distinction: threats and menaces of insult or injury to a Judge, in case he shall render a certain judgment, may be considered as impairing his independence and impartiality in the particular Case to which the threats refer. And if the power of punishment stop here, a curious consequence may ensue. A man may be attached for threatening to do that for which he could not be attached, when actually done. One says of a Judge, “If he render a certain judgment against me, I will insult or beat him.” For this, he may be attached. But, if (the judgment having been rendered) the insult be actually offered, an attachment no longer lies; because the contempt is in relation to the past conduct of the Judge, and to a Case no longer pending. A recurrence to original principles, the only true test, by demonstrating that the weight, authority, and independence of the Court may be equally assailed either way, will prove that this distinction is merely ideal.
*But, thirdly, it is said: that there have been occasions in .England for the exercise of this power, if it existed, and Junius’s Letters to Lord Mansfield are cited: and an argument against the existence of the power is deduced from the non-use of it on that occasion. Without doubt, these letters strongly implicate and arraign the integrity of Lord Mansfield in his Judicial character. If the power did exist, that would seem to have been a case, in which it might have been exerted. There can be as little doubt, that it was a case in which, in that country, the publisher might have been prosecuted for a libel. These very Letters were denounced in the House of Lords as a libel on the Judges; and yet no information for a libel was ever moved. Would this fact be cited as an evidence, that on letters of a like character, an Information for a libel could not be maintained? All negative proof of this description should be cautiously received; it may be admitted to explain, but not to over-rule principles. This celebrated writer, in a letter to Wilkes, said, ‘It is not that precedents have any weight with me in opposition to principles.” What would he have said to the proposition that principles should have no weight, because precedents could not be found to support them? It is not possible to pronounce with certainty, at this time, on the motives which may have induced forbearance on the part of Lord Mansfield, on the occasion just alluded to. Considerations of a political nature were probably at the bottom of it. Very strong reasons are to be found in the contemporaneous speeches in both Houses of Parliament. In these, it was not pretended that Junius had kept within the pale of the Law. But, “to the spirit of the times, and not to the justice of his cause,” (I quote the words of some of these speeches,) was it said, that the “mighty boar of the forest had broken through the cobwebs of the Law, and ranged uncontrolled and unpunished through the land.” (See the speeches of Ivord North and Mr. Burke.) It would be strange, indeed, for this Court to assume as the true cause of the inaction of the Courts on that occasion, amongst the many to which it might be traced, one, which it understands to be in conflict with those great original principles which are co-eval, and must be co-existent, with the administration of justice every where; the power to protect itself.
The necessity of this power, in all the branches of Popular Government, has been generally admitted. Where it *is not inherent, it has been conferred. It is said, upon high authority, (see the Federalist, No. 73, p. 397,) to have been “the primary inducement” to conferring on the President of the United States the qualified negative on the Acts and Resolutions of the two Houses of Congress. It is the principle of that clause in the sixth section and first Article of the Constitution of the United States, which protects the Senators and Representatives from ‘ ‘ being questioned in any other place for any speech or debate in either House.” And of a like provision in our own State Laws, (see 1 Rev. Code, p. 164, (j 32, 33, 34,) with respect to the members of the General Assembly of this State. To the same source are to be traced the Cases which have settled, that a Judge, acting within *296 the scope of his jurisdiction, shall not be called on to answer for his judgment, except by impeachment, howsoever erroneous, malicious, or even corrupt, it may have been. Floyd v. Baker, 12 Co. Rep. 23; Groenvelt v. Burwell, 1 Lord Raym. 454; Miller v. Seare, 2 Black. Rep. 1141; Johnson v. Sutton, 1 T. R. 513; Yates v. Lansing, 5 Johns. 282; Aier v. Sedgwick, 2 Roll. Rep. 199; Hammond v. Howell, 1 Mod. 184, 2 Mod. 218. The language of Judge Kent, in the Case of Yates v. Lansing, is worthy of being quoted on the present occasion. In the conclusion of his elaborate and able opinion in that Case, the Chief Justice said: “Whenever we subjectttíel,est'abl'ísh'ed Courts of the land to the degradation of private prosecution, we subdue their independence and destroy their authority. Instead of being venerable before the public, they become contemptible; and we thereby embolden the licentious to trample upon every thing sacred in society, and to overturn those institutions, which have heretofore been deemed the best guardians of Civil Liberty.” Sergeant Hawkins, in his Pleas of the Crown, B. 1, ch. 7, p. 6, in stating the same proposition, in very broad terms, amongst other reasons for it, assigns the following: that if they were thus responsible, “it would be impossible for them to keep up in the people .that veneration of their persons and submission to their judgments, without which it is impossible to execute the Laws with vigor and effect.” I shall not stop to enquire, whether this degradation of the Judicial character, which is so much deprecated, would be greater or less, from the Judge being Plaintiff or Defendant- in a Civil action, or prosecution for a misdemeanor, springing out of his official conduct. Or, ^whether the public respect for his character and station, would be more impaired by his being subjected to an action on the cáSe, or to a gross and most degrading personal insult.
It has never been doubted, as far as I am informed, that the privilege of members of Congress and' of the General Assembly, is not only defensive, but also is vindicatory; and that for a breach of it, tlféHóusé 'may commit the offender. 1 Bl. Com. 165; Murray’s Case, 1 Wils. 300; Sir Robert Brand-ling’s Case, of which there is a note in Jacob’s Law Diet. vol. 5, p. 54. By reference to our own Acts of Assembly, it will be seen, that in the 32d section, quoted above, high penalties are annexed to this breach of privilege. And, indeed, it would seem to be a solecism to declare the privilege; to make it a protection against the operation of the ordinary process of Law; and even highly penal to resort to that process; and yet, when actual indignity or violence is used, to hold the privilege for nought. So with respect to the Judge. Is it not inconsistent to admit, that he may use his privilege as a shield against a Civil suit, or Criminal prosecution, for even an unrighteous judgment, but that when abused or assaulted for a righteous one, he has no resource but that which is open to every citizen, an action or indictment, or resort to personal force?
In the early annals of Jurisprudence, in those countries from which the spirit of our own Laws is derived, a careful preservation of the Courts of Justice from the indignities and injuries of the violent and lawless, may be frequently remarked. The rigor of the Gothic Constitutions, in this particular, has been before mentioned. By the ancient Common Law, before the Norman conquest, striking, in the King’s Courts of Justice, or drawing a sword therein, was a capital felony. 4 Bl. Com. 125. By an old English Statute, which is still in existence,': thou'gh obsolete in practice, a stroke, or blow, in such Court of Justice, whether blood be drawn or not, or even assaulting a Judge, sitting in the Court, by drawing a weapon, without any blow struck, is punishable with the loss of the right band, imprisonment for life, and forfeiture of goods and chattels, and of the profits of the offender’s lands during his life. Ib. By Statute 19 Edward 3, striking á juror in the presence of the Court, was made punishable with the loss of the right hand, and perpetual imprisonment. Finch’s Com., *Law, p. 79. In the reign of 1 Charles, a man was fined ¿5,000, (an enormous sum in those days,) was made to go to all the Courts in Westminster Hall, with a paper on his head shewing his offence, and make his submission to them, and finally was ordered to be imprisoned during the King’s pleasure, for going into the Court of Common Pleas, while in session, and. saying, “I charge Justice Hutton,” one of the Judges, “with High Treason.” And we have before seen that men have been fined and imprisoned for assaulting or menacing heir adversaries for suing them; the Counsel or Attorney for bringing the suit; the witness for his testimony ; the juror for his verdict, and even the jailor for keeping him in custody.
With this array before our eyes, can it be credited that it should be so highly penal to assault or abuse a Judge in Court for his Judicial proceedings, and no offence to do the same thing to him the moment after his leaving the Bench, on account of the same provocation? Can it be considered a matter of so much consequence to protect the person of the suitor, the lawyer, the witness, the juror and jailor, and of none to defend the Judge? Not that I mean to arrogate any higher personal privilege for the Judge than for the humblest o.f these: but because it is obvious, that the principle which suggests the necessity of protecting them, rises with the grade of the officer; and that the majesty of the Laws may be more degraded in the person of the highest, than of the lowest officer entrusted with their administration. As to the practical operation and effect of these principles, it seems to me, that whilst the power, if conceded, will be guarded from abuse by the Constitutional responsibility of the Judge, and the influence of public opinion, (next to the warnings of his own conscience, the *297 strongest of all restraints, and one which increases with the dignity of his station and the elevation of his character in public estimation,) that on the other hand, if it be denied, the independence of the Bench will be vitally wounded ; its weight and influence diminished; the occasions and facilities of detraction and insult multiplied; and in the end, the sound administration of Justice made to depend, not less on the strength of nerve and personal firmness of the Judge, than on his learning, wisdom, and integrity.
The result is, that in my opinion, the Defendant has been guilty of a contempt, for which an attachment might have been issued. Upon this attachment, he is of course liable *to fine and imprisonment, unless upon the interrogatories to be propounded to him, he shall purge himself of the contempt: and if the interrogatories airead answered by him, are to be regarded as if propounded, upon an attachment, I should have no hesitation in answering the third point submitted to this Court, in the negative. But this involves an enquiry into the proper mode of proceeding in this Case, as submitted to this Court, by the Superior Court of James City, in the second question upon this record.
In the view which I have taken of the first question presented for our consideration, it is apparent that I have not regarded the insult to the Judge as a contempt of the Superior Court then holden for the county of James City. The Case of The Commonwealth v. Stuart and others, in this Court, has decided that in the intervals of adjournment during the Term, the Court is not to be regarded as sitting, so as to subject one to the process of attachment for such conduct to the Judge, as would have amounted to a contempt during the actual sitting of the Court. And although in the Case at bar, the hour to which the Court had adjourned, might have actually arrived, yet as the Judge had not gone upon the bench, nor even entered the Court-house, the Court cannot be considered as having been then open. It was, therefore, either a contempt of the Superior Court of James City, in relation to the previous Term, when the judgment was rendered, on account of his remarks, in pronouncing which, the Judge was insulted, (as in the case of an indignity offered in the vacation to one of the jurors, who might have rendered the verdict in the Cause, which must have been proceeded against at the September Term, as for a contempt of the Court at the preceding Term,) or it was a contempt of Court in the person of the Judge, for, and on account of, his Judicial proceedings. The positions are probably convertible; be it as it may, for the purpose of this question, either view suffices. In neither can the proceeding be had, as for a contempt in the face of the Court actually sitting. In such case, the proper course is, at once to punish the offender by fine or imprisonment, or both. The process of attachment has no other object than to bring the party into Court. 4 Bl. Com. 287. This, his actual presence renders useless; and there can be no need of interrogatories to ascertain that which has occurred in open Court. Where the contempt has not been committed in open Court, the common proceeding *is bj7 rule to shew cause why an attachment should not issue; though this rule has been sometimes dispensed with. Rex v. Jones, 1 Stra. 185; Dr. Bentley’s Case, Ib. 557. As the object of the attachment is to bring the Defendant into Court, so that of the rule is no other than to give him notice, and a day in Court, to make1 his defence. The party may not choose to appear to shew cause against the rule; in which case, the attachment must issue to bring him in. But if he do appear on the rule, and instead of moving to discharge it, submit to answer interrogatories, if by these he do not purge the contempt, there can be no good reason (he being actually present in Court,) why the Court should go through the formality of an attachment, and a repetition of the interrogatories. But as the whole end of the more formal proceeding is answered, and there is nothing in the Law which positively enjoins a rigid technicality, it would seem as proper to proceed at once to judgment. In like manner, there is nothing in reason, or the letter of the Law, which makes a formal technical Rule, indispensably necessary. The rule is intended for notice to the Defendant; and if the proceedings against him shall appear to have given him the same notice and opportunity of defence, that he would have had on a formal rule, I see no reason why it should be deemed absolutely indispensable. It is on these grounds, I presume, that both the rule, and attachment, are dispensed with, when the contempt is committed in the face of the Court.
Let us test the proceedings in this Case, by these principles. The contempt was committed at the Court-house door: immediately afterwards, the Court having been opened, and Mr. Dandriflge present, a written statement of the facts was exhibited by the Judge. This, had all the effect of an affidavit, as to giving notice to Mr. Dan-dridge of the matter with which he was charged; and, as an affidavit was not necessary for any other purposes than to serve this end, and inform the Court, the statement was, to all intents and purposes, a perfect substitute for it. But the affidavits of sundry witnesses, were at the same time actually taken; and thus furnished the most formal ground for a rule. And, in fact, a rule “to shew cause why he should not be committed, or fined, for his said contempt,” returnable on the morrow, was immediately made. As Mr. Dandridge was at the same time recognized to appear on the return of this rule, it was- more proper that it should have been in this *form, than to shew cause why he should not be attached, which would have produced only unnecessary circuity *298 and delay. On the return of this rule, the Defendant appeared, and whether he made no motion to discharge it, or an unsuccessful one, does not appear. He was ruled to appear the next day, to answer interrogatories. Had the attachment been awarded on the second day, nothing would have been wanting to the most perfect regularity of proceeding, but the formality of entering an order, that the rule to shew cause should be made absolute. But, it has been before shewn, that this award of attachment was unnecessary, as a more effectual method of securing the Defendant’s appearance in Court, viz. a recognizance, had been adopted: and, as to making an entry on the records, that the rule to shew cause was made absolute, that was a mere formality, as it was necessarily implied in the order to answer interrogatories. On the third day, then, (the Defendant having had due notice on the second, of the intended object,) he appeared in Court, and did answer the interrogatories filed by the Attorney for the Commonwealth. These interrogatories, I must regard in the same light" ■as if they had been propounded on the return of an attachment; for, although there was a slight irregularity in the proceeding, it was substantially correct, ■and the Defendant was not deprived of any right, or advantage, thereby. The answer, therefore, that X would give to the second question adjourned to this Court, would be; that now no rule for an attachment, nor the attachment itself, should be awarded: And, as this renders an answer to the third question necessary, X would say, that the Defendant had not purged himself of his contempt, by his answers to the interrogatories propounded by the Attorney for the Commonwealth.
As to the fourth question upon this record, it is one upon which, in point of Haw, the Judge of the Superior Court of Haw of James City county, cannot need our advice; and upon which, in point of fact, he is more competent to decide than we are. I would, therefore, decline answering this question.
"WHITE), J.,
pronounced the following opinion:
The luminous and eloquent view which my brother, Dade, has taken of the reasons, and the principles, upon which the power of Courts to proceed by attachment, is *founded, has rendered it unnecessary, and, indeed, improper, for me to say much upon that subject: I shall, therefore, proceed to consider this Case, upon its merits, as disclosed by legal authority, with as little departure from that course, as possible.
The most important question adjourned to us, is, did the conduct and language of Mr. Dandridge, on this occasion, amount to such a contempt of the said Court, as to justify it in proceeding against the Defendant, by attachment? It is not denied, but that a right to proceed in that manner, does belong to that Court, when a proper case for its exercise arises. But it is contended, that in general, and upon principle, no contempt can be committed to any Court, unless it be in Session at the time, and the contempt be committed in its face. And, that no contemptuous words, spoken to, or of a Judge, during the recess, or vacation of his Court, however deeply they may implicate his Judicial conduct, can be thus punished. And that the few cases, which seem to form an exception to this principle, and in which the books shew, that attachments have issued for contempts committed out of the presence of the Court, are confined to contempts offered, in the country, to its process, to mal-practices by its officers, and the like, but do not in any way justify the proceeding in the present case.
The argument upon this point was specious and imposing. Whether it was substantially correct; and whether the result endeavoured to be produced by it, be in accord with, either the public good, or the great principles of Haw, long since, established, (not for the private gratification of the Judges, but to insure the well-being of society,) is another question; a question of solemn import to every man, who looks to the Haws of his country for the preservation of all he holds dear.
We cannot prostrate the Courts of the country at the feet of every disappointed suitor,. who may happen to lose his cause, or whose conduct may necessarily elicit from a Judge, observations unpleasant to his feelings, without producing the most fatal consequences. No! destroy the protection which the Haw now gives to 3’our Courts, unloose the hands and tongues of such persons, expose your Magistrates to their abuse, contumely, and vituperation, for their Judicial cbnduct, without any immediate and efficacious means of restraint, and instead of that happy, dignified and peaceable state of societjr which we now enjoy, we shall *soon find that we have neither Haws nor Magistrates : and let it be remembered, that in this country we ought not to have, we have not, any privileged order of men. If one man is restrained from such conduct, every other man must be subject to a like restraint. If one man is at liberty to pursue it, every other man must enjoy the same liberty.
The importance of this question, the ability and zeal with which it has been argued by the Counsel of the Defendant, require, that the doctrine of attachment for contempts, should be fully examined, and deliberately and maturely weighed: And, if in an attempt to do this, I should occupy more time than could be wished, this must be my apology.
Het us then go to the fountain head, and hear what the great elementary writers, the fathers of our jurisprudence, say upon this subject, and then look into some Judicial decision founded on the principles laid down by them.
Hawkins, in his 2d vol. of the Pleas of the Crown, chap. 1, sec. IS, among other things, says, ‘that all such Courts, (that *299 is Courts of Record,) may impose reasonable fines upon all such as shall be guilty of any contempt in the face of the Court; and that all such Courts except the Court leet,” (from which the power to commit, is taken by Magna Charta and a Statute,) “may imprison such offenders;” and in his 22d chapter of the same vol. in his introductory remarks, he say's, “Having shewn in what manner offenders may be apprehended without process from a Court of Record, I am now to shew in what manner they may be brought into Court by such process, of which there are two sorts: 1. Such as may be awarded by the discretion of the Justices, upon a bare suggestion, or their own knowledge without any Appeal, Indictment or Information: 2. Such as can be awarded only on such accusations;” and then in sec. 1st, he say's, “and first, I shall consider the nature of the first of these, which is generally called an attachment, and is properly grantable in cases of con-tempts, against which, for the most part, all Courts of Record generally, but more especially those of Westminster Hall, and above all, the Court of King’s Bench, may proceed in a summary manner according to their discretion.
“And if they happen tobe done by a person present in Court,” (here he does not say' in the presence or face of the Court, but by a person present in Court,) “and'^appear either by the confession of the party, or on his examination on oath, or by the view or observation of the Judges themselves, the Court may immediately record the crime and commit the offender, and also, inflict such further punishment, as shall seem proper.
“And if such offence be done by a person not present in Court, and be complained of by affidavit, the Court will either make a rule upon the party to attend at a certain day in order to answer the matter of complaint against him, or else will make a rule upon him, to shew cause why an attachment should not be granted against him; or else if the offence were of a very exorbitant nature, as for words of contempt of the Court itself, will grant an attachment on the first complaint without any such rule to shew cause.”
He then goes on to speak in the 35th and 36th sections, of contempts committed in the face of the Court, and such as are committed otherwise, and says, sec. 35, “as to the second particular, where persons are punishable in the manner above mentioned, for contempts in the face of the Court. It seems clear, that all persons are punishable in this manner, not only for making an actual breach of the peace, but for any heinous misdemeanor in the face of the Court, as by giving, and also trifling answers upon an examination in Court, &c. or by any contemptuous behavior towards any Judge in the face of the Court, as charging him with injustice, and praying for an information against him,” &c.
Having thus disposed of the second particular concerning contempts in the face of the Court, in the 36th section, he goes on to sa3T, “as to the third particular, where persons are punishable in the manner above-mentioned, for contemptuous words or writings, concerning the Court, it seems needless to put any instances of this kind, which are generally' obvious to common understandings, and therefore, I shall only observe, that sometimes attachments have been granted for contemptuous words concerning the rules of the Court, without making any rule to shew cause, &c.”
“Attachment, (says Jacobs in his Law Dictionary, head Attachment,) signifies to take or apprehend by command of a Writ or precipe. It differs from an arrest, in that he that arresteth a man, carrieth him before a person of higher power, to be disposed of; but he that attacheth, keepeth the party' attached, and presents him in Court at the day' '^appointed, &c. And for contempts, when the party appears, he must upon his oath, answer interrogatories, &c.”
Treating upon this subject, Blackstone in the 283d page of his 4th vol. says, “To this head of summary proceedings, may be referred the method immemorially used by the Superior Courts of Justice, of punishing contempts by attachments and the subsequent proceedings thereon.” “The contempts which are thus punished, are either direct, which openly insult or resist the powers of the Courts, or the person of the Judges who preside there, or else consequential, which, without such gross insolence or direct opposition, plainly tend to create universal disregard of their authority;” and, having given, among other examples, those committed “by Attornies and Solicitors, who are officers of the respective Courts, by gross instances of fraud and corruption, injustice to their clients or other dishonest practice,” he assigns the reason why they are so liable: “For (says he,) the mal-practices of these officers, reflects some dishonour upon their employers, and if frequent and unpunished, creates among the people, a disgust against the Courts themselves.”
And in pages 285, 286, 287, he says, “some of these contempts may arise in the face of the Court, as by rude and contemptuous behaviour, &c. Others in the absence of the party, as by disobeying the King’s Writ, &c. by speaking or writing contemptuously of the Court or Judges, acting in their Judicial capacity, &c. And by any thing, in short, that demonstrates a gross want of that regard and respect, which, when once Courts of Justice are deprived of their authority, (so necessary for the good order of the Kingdom,) is entirely lost among the people.”
“The process of attachment for these and the like contempts, must necessarily be as ancient as the Laws themselves. For Laws, without a competent authority to secure their administration from disobedience and contempt, would be vain and nugatory. A power, therefore, in the Supreme Courts of Justice to suppress such contempt *300 by an immediate attachment, results from the first principles of Judicial establishments, and must be an inseparable attendant upon every Superior Court; accordingly, we find it exercised, as early as the annals of our haws extend. ”' Let me. stop here, for a moment, to observe, that among the crimes punishable by this process, and which may be committed in the absence of the parties, “speaking or writing ^contemptuously of the Court, or the Judges acting in their Judicial capacity,” are expressly included, and that (as it would seem) to .protect the meaning of the author from the possibility of being misunderstood, .the .word. ‘ ‘ Judges, ” is not only disjoined from'the word'Court by th’fe disjunctive or, but by two including commas, and to enquire if committed in the absence of the party, how it, the contempt, could possibly be committed in the face of the Court? And how it can fairly be supposed, that this learned, perspicuous, laborious and precise author, has twice in the same chapter, when treating upon the same subject, by mere mistake or inattention, thus disjoined the word Court from the word Judges; when, too, the interposition of the disjunctive or, would so materially alter the meaning of his sentences, and the Criminal Law of his country?
The author goes on to say, that ‘if the contempt be committed in the face of the Court, the defendant may be instantly apprehended and imprisoned at the discretion of the Judges, without any further proof or examination. But, in matters which arise at a distance, and of which the Court cannot have so perfect a knowledge, unless by the confession of the party, or the testimony of others, if the Judges upon affidavit, see sufficient ground, &c. ” and then proceeds to explain the manner of proceeding by attachment, in the same way in which Hawkins had before explained it. Observing, that “this process of attachment is merely intended to bring the party into Court.”' 2 Atkyns, Case291, vide page 469. This was a motion made to the High Court of Chancery, in England, to commit certain, printers for contempt to that Court, by publishing certain statements and remarks respecting a cause which had been before the Master of the Eolls, and reported upon by him, and his report confirmed by the decree of the Lord Chancellor’s; but which was not then finally determined, but still depending in Court for further proceedings. In these publications, the cause, the parties, and witnesses on one side, were aspersed.
Page 471. The Lord Chancellor says, “It is insisted, that the following words, (part of the words complained of,) are not a contempt of this Court, because here is no misrepresentation of facts, and the Court spoken of with great respect. And indeed, it is very true, but then this is colourable only, and such colours shall ne'ver impose upon the Court.”
There are three different sorts of contempt; one kind of contempt, is scandalizing the Court itself. There may be likewise a contempt of this Court, in abusing parties who are concerned in causes here. There may be also a contempt of this Court, in prejudicing mankind against persons, before the cause is heard.”
In the Case Respublica v. Oswald, 1 Dallas, 319, Chief Justice M’Kean says, “as a ground for granting the attachment, it is proved, that an action for a libel had been instituted in this Court, in which Andrew Browne is the Plaintiff, and Eleazar Oswald is the Defendant. That a question with respect to bail in that action, had been agitated before one of the Judges, from whose order, discharging the Defendant on common bail, the'Plaintiff had appealed to the Court, and that Oswald’s address to the public, which is the immediate subject of complaint, relates to the action thus depending be ore us.”
“The Counsel in support of their motion, have argue'd, that this address was intended to prejudice the public'mind upon the merits of the cause, by propagating an opinion, that Browne was the instrument of a party to persecute and destroy the Defendant, that he acted under the particular influence of Dr. Rush, whose brother is a Judge of this Court; and in short, that from the ancient prejudices of all the Judges, the Defendant did not stand a chance of a fair trial.”
“Assertions and imputations of this kind, are certainly calculated to defeat and discredit the administration of justice. Let us therefore enquire, first, whether they ought to be considered as a contempt of the Court, and secondly, whether, if so, the offender is punishable by attachment.” After some very strong and just observations on the liberty of the press, he goes on, in pages 32S, 326, 327, to say; “there can be little doubt, that he, who attempts to raise a prejudice against his antagonist, in the minds of those that must ultimately determine the dispute between them; who, for that purpose, represents himself as a persecuted man, and asserts that his Judges are influenced by passion and prejudice, willfully seeks to corrupt the source, and to dishonour the administration of Justice.”
“Such is evidently the object and tendency of Mr. Oswald’s address to the public ; nor can that artifice prevail, which insinuates that the decision of this Court will be the effect of personal resentment; for, if it could, every *man might evade the punishment due to his offences, by first pouring a torrent of abuse on his Judges, and then asserting that they act from passion, because their treatment has been such as would naturally excite resentment in the human disposition,” and then, after glancing at the high sanctions which the Law has prepared to ensure the impartiality of the Judges, he proceeds to declare,-that the. Court was unanimously of opinion, that the publication in question, amounted to a contempt, and further, that it' was punish *301 able by attachment; upon the latter point he observes, “being'a contempt, if it is not punished immediately, how shall the mischief be corrected? Leave it to the customary forms of a trial by a jury, and the cause may be long in suspense, while the party perseveres in his misconduct. The injurious consequences might then be justly imputed to the Court, for refusing to exercise their legal power in preventing them.”
Bj these authorities, the following principles seem to be clearly and unquestionably established.
1. That every Court of Record, and, more emphatically, every Superior Court, has a right to punish contempts offered to it, by fine and imprisonment; and that this power is given to those Courts, not for the private advantage of the Judges who sit in them, but to preserve to them “that regard and respect, which, when once Courts of Justice are deprived of their authority, (so necessary for the good order of the Commonwealth,) is entirely lost among the people,” and that (for that reason), “it results from the first principles of Judicial establishment, and must be an inseparable attendant upon every superior tribunal.”
2. That these contempts to Courts, so punishable, maj be committed either in the face of the Court, or in the absence of the party (that is, the Court) so insulted.
3. That those contempts which may be committed in the absence of the party, for reasons which I need not now detail, may, among other things, be committed by speaking or writing contemptuously of the Court, or Judges, acting in their Judicial capacity, or by saying or writing any thing which is calculated to prejudice the public mind respecting any suit then depending in Court.
4. That if this happen to be done by a person present in Court, and appears, either by confession of the party on his oath, or t>3 the view or immediate observation of the Judges themselves, the Court may immediately record *the crime, and commit the offender, &c. “Theproc-ess of attachment being merely intended to bring the party into Court, that when there he may be dealt with according to Law.”
5. That, for contempts “committed in the face of the Court, it may immediately record the crime, and without any farther examination, commit the party,” and for the best of reasons, because the Judges have the highest of all possible evidence, the perception of their own senses.
6. If the matters arise at a distance, of which the Court cannot have so perfect a knowledge, unless by the confession of the party, or the testimony of others, it will, in its discretion, award the proper process to bring the party before it, of which the process of attachment is one.
7. That when the Court is in possession of his body, it will, according to the circumstances of his case, commit him to answer interrogatories, or take his recognizance to appear and answer them. Upon his answers to which interrogatories, the fate of the proceeding will depend: Although he may thereafter be indicted for perjury therein.
8. That to scandalize a Court by speaking or writing, either in its presence, or in its absence, is a high contempt; and how can a Court be scandalized, except by scandalizing the Judges, or some one of the Judges, who sit in it? A Court, apart from its Judges, exists only in abstract idea, in contemplation of Law, and viewed thus apart from them, it has not, it cannot have, any moral character to be scandalized. But let its Judges be considered as corrupt cowards, when acting in their Judicial capacity, and it is instantly covered with opprobrium and contempt.
9. That it is a high contempt, punishable as aforesaid, to punish, by speaking or writing, any thing during the pendency of a particular cause in any such Court, by which an imputation is cast upon the Judges, or any one of the Judges thereof, as to their purity, impartiality, or integ-ritjq as respects that cause.
After attempting to avoid Blackstone’s positive declaration, that “a contempt to a Court may be committed in its absence,” by speaking or writing contemptuously of the Court, or the Judges, acting in their Judicial capacity, it still remained to the Defendant’s Counsel to get over the many other authorities, which declare, that con-tempts, punishable by attachment, may be committed in the absence of the Court. And this has been attempted by en-deavouring *to confine that doctrine to contempts committed to the process of the Court, and other like cases. But what an immense difference is there, as respects the great object which the Law had in view, in establishing this proceeding by attachment, between the offences committed by Attornies spoken of by Blackstone, or that committed by a rude and vulgar man in the country, when a Rule of Court was served upon him by, perhaps, the lowest officer of the Court, and that here charged upon the Defendant And if an attachment may issue in those cases, let common sense assign a reason, if it can, why the Defendant should not be equally responsible in this case. I forbear to depict the fatal consequences which would result from a different doctrine.
But authorities are introduced which prove that a Court may fine and imprison for a contempt committed in its face, and cases to prove that this has often been done; and what then? Does this shew that a Court cannot commit for the like offences perpetrated out of Court? Do not Hawkins and Blackstone both declare, first, that a Court may commit for contempts in its presence, and having disposed of that point, proceed to state, that it may also fine and imprison for contempts committed in its absence, and state what those latter con-tempts are, and show how in such case, the Court must proceed? The material difference between those cases seems to be, that *302 in the first, the offender being- in Court, and the offence known to its members, the Court may proceed to inflict the punishment immediately, without any other proceedings. But in the latter, process must issue to put his body in the power of the Court, and evidence be,produced to satisfy the Court that the offence was committed.
But it has been insinuated, that no case can be produced, in which the Courts have, in cases like this, exercised that power. But it is believed that the Case out of 2 Atkyns; Oswald’s Case; and the Case of The King v. Barber, Strange, 444, furnish a complete answer to this suggestion. In the latter Case, Barber had presented a petition to the Common Council of London, in which he reflected on one of the Aider-men, and used contemptuous words of the Court of King’s Bench. For the petition, the Court of King’s Bench granted an- Information, and for the contempt, an attachment. Was the presenting the petition to the Common Council, with these contemptuous words *in it, a contempt committed in the face of the Court of King’s Bench? In Oswald’s Case, the contempt consisted, as well in the insinuations that one of the Judges was under the influence of his brother, who was represented as the persecutor of Oswald, and that the other Judges were prejudiced against him on account of former transactions, as in the attempt to raise a general prejudice against the cause of his opponent.
The insinuation that these Cases might have been influenced by the circumstance of their being in writing, or print, and that, therefore, they partook of the nature of libels, can have no weight, because the authorities put the writing and speaking contemptuously of the Judges, in their Judicial capacity, upon the same footing, and because this very Case furnishes proof, that by a" combination of time, place, and circumstances, speaking such words may produce as great, if not greater evils, than writing or printing the same words would have produced. Other authorities were relied upon by the Defendant’s Counsel. But, upon examination, it will be found, that the contemptuous words complained of, were spoken of Inferior Courts, or the Judges of Inferior Courts, who have not authority to proceed by attachment for contempt, as Courts leet, Ecclesiastical Courts, &c.' of which there are many in England; or that it did not appear the officer was a Judge of a Court having such authority; or that the words did not appear to have, been spoken of his Judicial acts. These authorities seem, therefore, not to bear upon this question. .
Let us, then, enquire how far those principles apply to the Case before the Court.
To do this correctly, it is necessary to take into view the time, the place, and all the circumstances connected with this gross insult, for such every one must consider it, offered to the Judge. A cause had been, and then was, depending in the Court, of which he was the sole Judge, against a Mr. Bassett as surety for. the Defendant, in the result of which, he (the Defendant,.) was deeply interested.. That cause had been once tried, and a new trial granted to Mr. Bassett. On the second day of the fall Term, in the year 1823, when that cause stood for trial, and during which Term, it was actually tried the second time, these contemptuous words were spoken to the Judge, as he was ascending the steps of the Court-house, to take his seat upon the bench, in reply to, at least, a civil and apparently *a friendly salutation. They charged him, with cowardice and corruption, upon a former occasion, in that very cause. This charge was thus openly made, at the very vestibule of the temple of Justice, in the presence of all who were there assembled, on this public occasion. Is it necessary to reason upon this subject? Does not every one perceive at once, that it was not only a gross personal insult offered to the Judge, but a high charge against his Judicial conduct, a gross scandal upon his Court, and eminently calculated to produce that want of respect and regard, of which when a Court of Justice is deprived, its authority, so necessary for the good order of the Commonwealth, is entirely lost among the people? Nay more; does not every one at all acquainted with the nature of Judicial proceedings, distinctly perceive, that it was calculated to have a deleterious effect upon the result of the aforesaid cause? That it was an imputation, which, if it could possibly have been believed, or even suspected to have been just, must have produced an opinion, that Bassett, who stood in the Defendant’s shoes, did not stand a chance for a fair trial, not merely on account of the prejudices, but of the vices of the Judge? Let it be remembered, that at the then expected trial, he was of necessity, to preside: That it was a duty from which he could not flinch, unless indeed, he was so cowardly as to be driven from it by the Defendant’s denunciation, not only to determine every question of Law with respect to the admissibility of evidence, &c. but to instruct the jury upon every question of Law, submitted to them, if called upon to do so. What reT spect would a juryman pay to, what confidence would he place in, the instructions of a Judge, whom he even suspected of having acted corruptly upon any occasion, but more especially in that very cause? Is it possible to imagine a charge more completely calculated to bring the Court, over which that Judge presides, into disrespect among the people, and utterly to destroy its usefulness? I think not, and therefore am bound to say, that the Defendant has committed a high contempt to that Court.
But it is said, that even if it be so, yet the proceedings in this case are novel and erroneous; there has been no Affidavit, no Rule, no Attachment, &c. But, was not this offence within the knowledge of the Judge; within his own knowledge; were not the words uttered to him, and of him? Could *303 any Affidavit or any number of Affidavits, *have made him better acquainted with them? Affidavits are only necessary to satisfy the Court of the propriety of enquiring into the matter. Upon the speaking of the words, he could have no doubt; the only doubt which could arise was about the occasion alluded to by him, and the motive by which he was actuated; and, indeed, from the circumstances attending the transaction, there could be but little doubt about them. Where is the reason or authority which, in such a case, can require previous Affidavits? This abuse, with all its circumstances, was within the knowledge of the Judge. He has stated it upon the record, and called upon the Defendant to say, whether that statement was or was not correct, and to say, whether the allusion and motive charged in that statement, weie also correct. The Defendant has answered and admitted the truth of the whole charge, as to the words, the allusion and the motive. How has he been injured, or otherwise subjected than he would have been, if Affidavits had been taken, a Rule granted, &c.? Why is the Rule or Attachment awarded? They are nothing but process to bring the person of the accused into Court, and are entirely unnecessary, when he is already there. But Mr. Dandridge was already there, and the statement of the Judge was read to him. What was required of him? That he should enter into a recognizance, to appear and answer interrogatories. The very thing that would have been done if he had been brought in upon process. And he has answered and honorably confessed the truth of the whole charge, the very thing which would have been done, if he had been so brought in. I really cannot perceive in all this, any impropriety, or how he has been injured. I will only add, I concur with’the other Judges in the opinions expressed by Judge Dade on the other points.
A few days after the rising of the Court, the following opinion on this subject, was prepared and transmitted with a request that it should be inserted, by R. E. Parker, J.
The facts of this Case, have been sufficiently set out in Judge Dade’s opinion, and so fully stated on the record, that I shall refer, as to this point, to those sources of information, without encumbering my opinion with detailing them. The most material and prominent circumstance of the Case, and the one, on which, in my judgment it turns, is this: that Judge Semple, as he was proceeding to open *his Court, was charged with cowardice and corruption in some conduct of his, relating to a cause then depending, and still undetermined between the parties. He understood this charge to have reference to his official conduct; the by-standers so understood it, and Mr. Dan-dridge himself distinctly admitted it, when called upon to purge himself of the contempt, on oath. This examination of the party on oath, seems to me to be intended for his benefit, and not to entrap or injure him. He can never be called upon to accuse himself, or to prove himself guilty of a contempt, for that would be against the first principles of Daw and Justice; but, if the Judge by other prima facie evidence, either of his senses, or the testimony of witnesses, is thereby satisfied that a contempt was intended, he may call upon the party, (who is presumed to know best his own intentions,) to explain the circumstances of presumption against him, and to purge himself of the contempt. This I regard as the party’s privilege, and as the constant practice is to discharge the Defendant, who, in cases of this kind, denies any evil intention, I also regard it as a circumstance obviating some of the objections to this mode of proceeding. A party cannot be punished by Attachment for contempt, who does not admit the facts or words, and that they were done, or uttered malo animo.
This being premised, I will enquire, whether the Court has power to punish such conduct as is stared in this record, in this summary way. And here it is only necessary for me to rely on well-established principles of jurisprudence, common to all governments, to maintain the affirmative. From the nature and fitness of things, Courts of Justice must possess all powers essentially necessary to enable them to effect the objects of their creation; that is to say, to carry the Daws into execution, bj administering justice, fairly and impartially, between man and man. Whatever obstructs them in this duty, or tends to hinder the fair and impartial administration of justice, or corrupts the fountain from which the stream flows, has always been, and must always be, considered as a high offence. Hence, if any of the officers of justice are so threatened, or insulted, for their conduct, as to make it apparent that such attacks, if permitted, would have an influence on the general administration of the Haws, the offender is obnoxious to punishment, on every principle of justice and expediency. And this for the same reason, that an attempt to bribe, or ^otherwise corrupt, an officer of justice, would be regarded as an offence. It is of the highest consequence to the people, that all persons concerned in the administration of justice, and especially the Judges, should be left free to exercise their functions according to the dictates of their understandings, uninfluenced by fear, or favour. And it is the right and privilege of the parties litigant before a Court of Justice, that neither shall have any unfair advantage over the other. But, if a Judge is threatened, insulted, intimidated, or charged publicly with cowardice, and corruption, for his former conduct in a suit which is still depending in his Court, is it not obvious that it may influence his judgment when that Cause is tried again, and may give one of the parties an undue advantage? If Judge Semple had been a timid pian, the conduct of Mr. Dandridge *304 might induce him to suppress on this second trial, the remarks he had^thought necessary and pertinent, on the first: if an irascible and vindictive one, it might induce him, almost unconsciously, to favour the side of the Plaintiff in the Court below, to the injury of Mr. Bassett, the Defendant, thus disturbing the impartiality of his judgment, and inclining him to one or other of the parties. Now, what difference does it make, whether this effect is produced by bribery, or any other improper means? Whatever has the tendency to such an effect, ought to be as carefully and promptly repressed, as if it would certainly produce it; for, in the imperfect state of man, it is impossible to say how far his conduct may be affected by attempts of this character. Again, it will be admitted that it is very necessary and proper to keep up in the minds of the people a sentiment of veneration and respect for their Courts of Justice, and a disposition to submit to their lawful authority. But this sentiment and disposition would be greatly impaired, if not destroyed altogether, by these public exhibitions of attacking and insulting a Judge for his Judicial opinions. If it were submitted to, it would inspire contempt; if forcibly resisted, it would set an example of more dangerous consequence to the morals of the people, than, any other that can well be imagined. ■ T-lie people know how to distinguish between their Courts of Justice, and the persons of their Magistrates, or Judges; and between an attack upon a Judge, for his official acts, and on some private account. It is when the insult is offered to his Judicial character, and in that character repelled "by force,' instead of appealing to the Laws, that the evil of the example, and the degradation of the Judicial character, would commence.
I believe the foregoing propositions were not denied, or questioned, by Mr. Dan-dridge’s Counsel, in his argument. He principally insisted on two points; 1. That it was irregular, and oppressive to call upon his client to admit the contempt; and 2. That as it was not committed during the actual sitting of the Court, and in its presence, it could not be proceeded against by attachment. On the first point, I have already offered the only remark I think it necessary to make. The second was chiefly argued on authority, or to speak more correctly, on the alleged absence of all authority to support the proceeding. On looking into the English authorities, I think it a fair and necessary deduction from them, that conduct of the kinds ascribed to Mr. Dandridge in this record, though not in the presence of the Court, may be proceeded against by attachment, and punished by fine or imprisonment, or both. The Judges who delivered their opinions, have fully commented on those authorities, and I will not repeat their arguments. Perhaps they may go far beyond this Case, and stamp with the character of contempts, words, writings, or acts, not within the principles I have mentioned, and not congenial to the free spirit of our institutions. I refer to them for no such purposes. It is enough for me, if they prove that the Case before us is a.contempt, punish.able by attachment; and, that what "I conceive to be defensible on principle, is not opposed by authority. In cases like the present, the remedy ought to be applied immediately, or it loses its effect, either as an example, or to prevent the recurrence of similar conduct. If the cause whose decision it may influence, is still depending, it cannot wait the issue of an Information, or Indictment. If a juror is threatened for his verdict, or a witness for his evidence, or an Attorney for his professional exertions, there seems a propriety in immediately punishing such conduct, from its manifest tendency to affect the fairness of legal proceedings, and many other cases might be mentioned, where it would be just as essential to arrest the evil at once, as to fine, and imprison a man instanter, who should attempt to pull the Judge from his seat on the bench, or interrupt the business of the Court, by any other rude and outrageous conduct. The Case at bar is one of this character, because *the charge of corruption was made publicly, and in relation to a Cause again to be adjudicated. It was placing the Judge in an attitude as to that Cause, which he ought not to have permitted himself to remain in for an instant, and its tendency was to make an impression on the by-standers, calculated to prevent an impartial investigation of that Cause, by prejudicing them against the Judge.
As to other Cases, they must depend on their own circumstances. It is not my business to define a doctrine, which admits, perhaps, of no such precision. The modes of interrupting the business, of defying the authority, of unduly influencing the proceedings of Courts, are so various, that an attempt at enumeration would be useless, and if successful, would be productive of no good. But, this much I maj be allowed to say, that if the English authorities will, as some think, justify the treating as a contempt all disrespectful words or writings, applied even to the official conduct of a Judge in his absence, and not having an obvious tendency to influence the decision of a Cause, I should not think myself bound to follow them. I am aware that the genius of our Government permits, nay encourages, a freer enquiry into the character and conduct of all public agents, than any other. I am also aware that no exertion of authority, however severe, can present the people from speaking disrespectfully of an unworthy Judge. And I know that it is quite possible to be very obedient to the authority of the Courts, and to entertain the highest respect for the Judicial office, and yet to feel and express great contempt for the individual who presides in it. The object of the Law in sanctioning this doctrine of contempts, is not, as has been very properly said, the personal benefit of the *305 Judges or Magistrates, but one of infinitely greater importance, and I •would not, from any notion of the entire amalgamation of Courts and their Officers, include within it, any Case not coming directly and palpably within the reason of the Rule.
It may be thought by some who admit the necessity of immediately punishing certain kinds of contempt, that it would be better to transfer the power to some other tribunal than the Court, especially where it consisted in personal disrespect to the Judge. This is a subject for Legislative, not Judicial investigation. At present, the power belongs to the Court, which has no authority even to impanel a jury, forthwith to try the facts, if it thought such a step desirable. *And it will probably be found that it cannot be lodged in safer hands. If a jury possessed it, they would too often regard it as a personal affair between the Judge, and the accused. If the Judge was popular and the other party the reverse, they might punish him severely for a slight offence. If their relative situation was changed, a very high contempt might be passed over without animadversion. Other objections might be stated, such as the greater responsibility of the Court, and the fact might be adverted to, of this power’s never having been abused. Indeed, I never heard of more than one or two instances of personal disrespect being offered or intended, to a Judge on account of his official conduct; and others instances of contempt are so rare, as to make the doctrine almost obsolete. As far as my personal knowledge of the people of Virginia extends, I can cordially unite with Mr. Leigh, in the sentiment, that no community requires less the exertion of any extraordinary powers on the part of the Court, to maintain its just authority. An habitual respect for the Law and the Magistrates who enforce it, is a striking trait in their character, and this feeling of deference and good will, has been reciprocated by the Courts to the mutual advantage of both parties. As, therefore, the principle I have been speaking of works well in practice, I should not be disposed to change it, because it maj' not be in exact conformity with abstract theories of right; but If any plan can be adopted of securing the undisturbed, and impartial administration of Justice, and the proper authority of Courts, in some other less objectionable mode, I am convinced there is not a Judge in Virginia, who would not prefer it to the exercise of undefined powers, especially in a Case where he may appear to be, although really he is not, a party.
As to the last question submitted to us, we have no evidence to enable us to answer it. The conduct of Mr. Dandridge, as exhibited in this record, could not be justified by any circumstances; but there may exist some of palliation or excuse, which ought to have their due weight with the Court. They must be referred to the sound discretion of the Judge acting under a high responsibility.
This opinion I should have given when the judgment was pronounced, but I had hoped and expected, until a very short time before, that the question would have been reargued. When I understood that this was declined, neither *the time nor my other engagements, allowed me to present my views of the Case, but I have thought it proper to embrace the very earliest moment after the rising of Court, to explain my reasons for concurring in the judgment entered.
The following judgment was entered in the Order-book of the Court:
The Court is unanimously of opinion and doth decide, that the attack made on the Judge of the Superior Court of Law for the county of James City and City of Wil-liamsburg, as set forth in the transcript of the record of the proceedings in this Case, does amount to a contempt of Court, for which the Defendant was liable to be fined or imprisoned, or both: that in the present state of the Proceedings in the Case, neither a Rule for an attachment, nor an attachment itself, need be awarded: that the Defendant has not, by his answers to the interrogatories filed, and propounded to him, purged himself of the said contempt: and that it is unnecessary and improper that this Court should decide upon the judgment which should be passed on the Defendant in this Case, as, after the answer which the Court has given to the first question, there is no point of Law involved in this question.